ISMIE MUTUAL INSURANCE COMPANY, Plaintiff and Counter-defendant-Appellee, v. MICHAELIS JACKSON AND ASSOCIATES, LLC, *et al.*, Defendants and Counterplaintiffs-Appellants (Marsha Turner *et al.*, Defendants and Counterdefendants-Appellees).

Fifth District    No. 5—08—0426

Opinion filed December 30, 2009.

Edward J. Kionka, of Carbondale, and Robert C. Wilson, of Wilson & Henshaw, of Harrisburg, for appellants.

Thomas M. Hamilton, Jr., Cecilia A. Horan, and Timothy G. Shelton, all of Hinshaw & Culbertson, LLP, of Chicago, for appellee ISMIE Mutual Insurance Company.

No brief filed for appellees Carolyn Swartos and Marsha Turner.

JUSTICE CHAPMAN delivered the opinion of the court:

In this declaratory judgment action, defendants Michaelis Jackson & Associates, LLC, and Michaelis Billy Jackson, M.D. (collectively Jackson), appeal from the trial court's July 16, 2008, order granting the motions filed by ISMIE Mutual Insurance Company (ISMIE) for a judgment on the pleadings and for a summary judgment from the trial court's order of the same date denying Jackson's motion for a summary judgment. At issue was ISMIE's duty to defend and indemnify Jackson for a suit brought by Marsha Turner and Carolyn Swartos, former employees of Jackson. These former employees had filed a *qui tam* suit against Jackson and alleged that Jackson had performed numerous medically unnecessary cataract surgeries and invasive follow-up procedures. ISMIE took the position that the allegations of the former employees fell outside of ISMIE's policy coverage. Specifically, ISMIE argued that there were no claims alleged against Jackson involving "personal injury" caused by "professional services." We affirm.

Jackson sought a defense and coverage from ISMIE in the United States District Court for the Southern District of Illinois from the suit brought by former employees under the False Claims Act (31 U.S.C. §3729 (2000)), for the alleged submission of false Medicare claims for reimbursement. According to the briefs of the parties, the case

remained pending in the federal court as of March 2009. ISMIE filed its declaratory judgment suit in state court. At issue in this declaratory judgment is the second amended complaint. This complaint was in five counts. Count I alleged that Jackson defrauded Medicare for $78,563.40 in reimbursements during a 3.5-year period (from July 1, 1999, through December 18, 2003) by claiming to have performed 23,921 diagnostic exams called gonioscopies (tests to determine whether the area where fluid drains from the eye is damaged, blocked, or clogged) that were not actually performed. Count II alleged that between January 2001 and December 2003, Jackson falsely made Medicare claims for reimbursement of $215,208 for 10,255 extended ophthalmoscopies (to look for retinal disorders). Count III alleged that Jackson performed 2,230 medically unnecessary cataract surgeries from January 2000 and December 2003, resulting in Medicare reimbursements of $1,146,592. Count IV alleged that Jackson purposefully scheduled cataract surgical follow-ups outside of the 90-day period, which took the appointments outside of the global billing system and allowed Jackson to be able to bill separately for care that should have been inclusive with the surgical fee. Count V alleged that Jackson performed 1,314 medically unnecessary YAG capsulotomies (a laser procedure to perforate the capsule of the eye to correct a post-cataract surgical complication in which the capsule thickens) for Medicare reimbursement claims of $181,990.48 between January 2000 and December 2003.

During the years in question, Jackson was insured for medical malpractice claims with a policy issued by ISMIE. ISMIE undertook the defense of Jackson pursuant to its "Supplementary Payments" section, which provided $30,000 of coverage for claims related to Medicare investigations. The $30,000 was paid out between September 28, 2006, and August 7, 2007. On August 7, 2007, ISMIE notified Jackson that the $30,000 was almost exhausted and that no further payments would be made on Jackson's behalf for the defense of the case. On October 5, 2007, ISMIE filed its declaratory judgment action to establish that its policy provided no additional coverage for the underlying *qui tam* suit.

In this declaratory judgment action, ISMIE filed a motion for a judgment on the pleadings on the basis that the Medicare fraud allegations were outside of the professional liability policy at issue. Jackson filed a summary judgment motion asserting that because the medical care at issue—the care for which his Medicare claims were being investigated—involved medical procedures (diagnostic testing and surgeries), the claims made should be covered under the malpractice coverage and not just under the Medicare investigation supplement.

ISMIE filed its own summary judgment motion arguing that the damages were related to illegally obtained reimbursement monies and not to personal injury.

The "Coverage Agreement" portion of ISMIE's policy provides as follows:

> " 'ISMIE' will pay amounts any 'insured' is legally obligated to pay as 'damages' because of any 'claim' against that 'insured' that is 'first made' to 'ISMIE' during the 'policy period' which involves 'personal injury' and is caused by 'professional services' provided on or after the 'retroactive date' and prior to the policy expiration date.
>
> * * *
>
> 'ISMIE' has the right and duty to defend any 'suit' against any 'insured' seeking 'damages,' even if any of the allegations of the 'suit' are groundless."

ISMIE's medical malpractice policy defines "damages" as "monetary compensation which is owed as a result of 'personal injury.' " The term "personal injury" is defined to include "bodily injury to *** any patient *** which arises out of the rendering or failure to render 'professional services.' " Listed as exclusions from coverage were "Medicare Investigations." The policy specifically excluded coverage for "liability of any 'insured' for actions for which criminal penalties could be assessed." The ISMIE policy also contained a supplemental payment provision that provides as follows: " 'ISMIE' will reimburse *** [a]ny 'named insured' for the cost of reasonable 'legal expenses' incurred because of a 'Medicare Investigation' provided always that the alleged or actual erroneous billings were submitted to the government health benefit payer or intermediary on or after the 'retroactive date[ ]' and that the 'named insured' had no knowledge[ of the 'Medicare Investigation' as of the inception of this policy. The maximum amount of reimbursement which may be requested by any one 'named insured' for any one 'Medicare Investigation' is $30,000 regardless of the number of policies or the number or timing of notices to 'ISMIE.' "

Because the case was decided based upon the pleadings and on a summary judgment, the trial court must strictly construe all evidence in the record against the movant and liberally in favor of the opponent. *Purtill v. Hess*, 111 Ill. 2d 229, 240, 489 N.E.2d 867, 871 (1986). The court must consider all pleadings, depositions, admissions, and affidavits on file to decide if there is any issue of material fact. *Myers v. Health Specialists, S.C.*, 225 Ill. App. 3d 68, 72, 587 N.E.2d 494, 497 (1992). On appeal, courts review summary judgments *de novo. Myers*, 225 Ill. App. 3d at 72, 587 N.E.2d at 497.

Additionally, because the construction of an insurance policy involves a question of law, we review that decision *de novo*. *American States Insurance Co. v. Koloms*, 177 Ill. 2d 473, 479-80, 687 N.E.2d 72, 75 (1997).

In situations where insurance policy language is ambiguous or uncertain—in other words, subject to more than one interpretation—that language must be construed in favor of the insured and against the insurer that wrote the policy language at issue. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 108-09, 607 N.E.2d 1204, 1212 (1992). The language utilized in a policy should be afforded its plain and ordinary meaning, and a court should not try to find an ambiguity in the language where none truly exists. *United States Fire Insurance Co. v. Schnackenberg*, 88 Ill. 2d 1, 5, 429 N.E.2d 1203, 1205 (1981).

With respect to insurance coverage issues, an insurer's duty to defend is broader than its duty to indemnify. *LaRotunda v. Royal Globe Insurance Co.*, 87 Ill. App. 3d 446, 451, 408 N.E.2d 928, 933 (1980). The duty to defend is determined solely from the allegations of the complaint. *Thornton v. Paul*, 74 Ill. 2d 132, 144, 384 N.E.2d 335, 339 (1978). If facts alleged in the complaint are within or potentially within policy coverage, the insurer must defend the claim even if the allegations are legally groundless, false, or fraudulent. *Thornton*, 74 Ill. 2d at 144, 384 N.E.2d at 339, citing *Maryland Casualty Co. v. Peppers*, 64 Ill. 2d 187, 355 N.E.2d 24 (1976), and 7A J. Appleman, Insurance Law & Practice §4683 (Supp. 1974).

A "potentially covered" claim exists "whenever the allegations in a complaint state a cause of action that gives rise to the possibility of a recovery under the policy." *Western Casualty & Surety Co. v. Adams County*, 179 Ill. App. 3d 752, 756, 534 N.E.2d 1066, 1068 (1989), citing *Tews Funeral Home, Inc. v. Ohio Casualty Insurance Co.*, 832 F.2d 1037, 1042 (7th Cir. 1987), citing 7C J. Appleman, Insurance Law & Practice §4683.01, at 67 (rev. ed. 1979). The language of the complaint does not need to affirmatively bring the claim within coverage under the policy, because the coverage issue should not "hinge exclusively on the draftsmanship skills or whims of the plaintiff in the underlying action." *Western Casualty & Surety Co.*, 179 Ill. App. 3d at 756, 534 N.E.2d at 1068, citing *International Minerals & Chemical Corp. v. Liberty Mutual Insurance Co.*, 168 Ill. App. 3d 361, 377, 522 N.E.2d 758, 768 (1988).

Jackson argues several issues on appeal, but the resolution of this case lies in a determination of whether or not the complaint sought an award of damages for personal injury potentially falling within the scope of coverage. Jackson argues that in keeping with the plain

language used in the contract, coverage exists if the claim is for damages that involve personal injury. In opposition, ISMIE argues that when considering all the relevant policy provisions, it has no coverage obligation unless the damages sought are *because* of a claim involving personal injury. In other words there must be a direct causal connection between the personal injury and the recovery sought. Jackson counters that there is no requirement that the underlying claim directly arise from a personal injury and that it is enough that the claim merely "involves" a personal injury.

Jackson contends that if ISMIE intended to exclude this type of case from coverage, the policy language should have required that the claimant in the underlying suit actually be the medical patient. Consequently, Jackson argues that the factual allegations related to patient care in the underlying suit satisfy the definition of a claim involving personal injury for coverage purposes and that nothing more is required. See *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 393, 620 N.E.2d 1073, 1079 (1993). Jackson contends that without proof that the underlying surgeries and tests were medically unnecessary, the underlying claim will fail. Thus, Jackson's argument is that the case involves personal injury because the genesis of the claim is the unnecessary medical procedures and surgeries.

In support of these arguments, Jackson cites to *Beatty v. Doctors' Co.*, 374 Ill. App. 3d 558, 871 N.E.2d 138 (2007). In *Beatty*, the trial court and the appellate court affirmed the arbitrators' decision to award damages to a physician against the malpractice carrier. While this case and *Beatty* both involved *qui tam* cases, the similarities end there. In *Beatty*, the insurer failed to defend Dr. Beatty under a reservation of rights and also failed to file a declaratory judgment suit. Notably, in our case, ISMIE is not estopped from raising coverage defenses, because the insurer sought a declaratory judgment. However, the greatest distinction between our case and *Beatty* involves the standard of review on appeal. The appellate review of a summary judgment is *de novo*, allowing us to consider all the aspects of the record and all the applicable law, essentially as if the trial court had not reached a decision. With an arbitrator's decision, the appellate court's review is severely limited. In *Beatty*, the parties agreed that any appeal of the arbitrators' findings would be governed by section 12 of the Uniform Arbitration Act (710 ILCS 5/12 (West 2004)) and was limited to very specific grounds. *Beatty*, 374 Ill. App. 3d at 561, 871 N.E.2d at 141. The appellate review of an arbitrator's decision requires us to examine the award and, if at all possible, " 'uphold its validity.' " *Beatty*, 374 Ill. App. 3d at 563, 871 N.E.2d at 142, quoting

*Galasso v. KNS Cos.*, 364 Ill. App. 3d 124, 130, 845 N.E.2d 857, 862 (2006). "[A]n arbitration award will not be overturned or set aside because it is illogical, inconsistent, or contains errors in judgment or a mistake of law or fact." *Beatty*, 374 Ill. App. 3d at 563, 871 N.E.2d at 142, citing *Galasso*, 364 Ill. App. 3d at 130, 845 N.E.2d at 862. "[A] court may only vacate an arbitration award where a gross error of law or fact appears on the award's face." *Beatty*, 374 Ill. App. 3d at 563, 871 N.E.2d at 142, citing *Galasso*, 364 Ill. App. 3d at 131, 845 N.E.2d at 862. Furthermore, even if the appellate court determines that the arbitrator made an error in judgment on a legal issue, that error does not create grounds for vacating an arbitrator's decision when the interpretation of the law is entrusted to the arbitrator. *Beatty*, 374 Ill. App. 3d at 563, 871 N.E.2d at 142-43 (relying on *Board of Education v. Chicago Teachers Union, Local No. 1*, 86 Ill. 2d 469, 477, 427 N.E.2d 1199, 1202 (1981)). In *Beatty*, the appellate court concluded that in order to determine if the arbitrators had erred in determining that the insurer had a duty to defend, the court would be required to undertake its own independent analysis. The fact that the court would have to scrutinize the reasons for the decision established that there was no gross error of fact or law apparent on the face of the award. *Beatty*, 374 Ill. App. 3d at 563-64, 871 N.E.2d at 143. We find *Beatty* to be of little value in deciding the case before us.

We find that a recent case from the federal courts is more on point. In *Health Care Industry Liability Insurance Program v. Momence Meadows Nursing Center, Inc.*, 566 F.3d 689 (7th Cir. 2009), two former nursing home employees exposed Medicare and Medicaid fraud committed by their previous employer. The two former employees filed a complaint under the federal False Claims Act (31 U.S.C. §3729 *et seq.* (2000)) and under a state whistleblower statute. *Health Care Industry Liability Insurance Program*, 566 F.3d at 691. The commercial general liability insurance carrier filed a declaratory judgment action in an effort to obtain a ruling that it had no duty to defend the nursing home pursuant to the policy. *Health Care Industry Liability Insurance Program*, 566 F.3d at 691. The commercial general liability policy provided coverage for damages resulting from injury caused by a medical incident that had to arise out of the providing or withholding of professional services, including medical services. *Health Care Industry Liability Insurance Program*, 566 F.3d at 692. The insurer filed a summary judgment motion, which the federal trial judge granted. *Health Care Industry Liability Insurance Program*, 566 F.3d at 692. The nursing home argued that the coverage was applicable because the insurer was legally obligated to pay for damages because of bodily injury. *Health Care Industry Liability Insurance Program*,

566 F.3d at 694. The nursing home stated that "the injury to the residents is the essential foundation" and that "[w]ithout such injury *** the [False Claims Act] claims *** would not have been brought." *Health Care Industry Liability Insurance Program*, 566 F.3d at 694. The nursing home argued that any damages resulting from the injuries underlying the False Claims Act allegations were therefore "because of" the "bodily injury" suffered by the nursing home residents, which, the nursing home argued, triggered the insurer's duty to defend. *Health Care Industry Liability Insurance Program*, 566 F.3d at 694. The Seventh Circuit Court of Appeals stated as follows:

> "Rather than triggering the duty, that line of argument effectively bypasses it. The injuries to the residents as alleged by the plaintiffs relate back to [the nursing home's] cost reports to the government where it certified that it provided quality services and care. Plaintiffs claim [the nursing home] knew that was false. The statutory damages they seek result from those allegedly false filings, and *not* from any alleged bodily injury to the residents. Although the allegations in the underlying complaint detailing the injuries suffered by [nursing home] residents put a human touch on the otherwise administrative act of false billing, they need not be proven by the plaintiffs to prevail. Under the [False Claims Act] ***, the plaintiffs do not have to show that any damages resulted from the shoddy care. [Citation.] Instead, all the plaintiffs need to show is that [the nursing home] billed the government for services and a level of care that it knew it was not providing. [Citations.]
>
> Other courts have recognized this distinction between the proof required for the [False Claims Act] claim and the conduct underlying the false claims. They uniformly hold that an insurer is not obligated to defend a qui tam suit merely because the insurer would have to defend the insured against a suit for damages resulting from the insured's conduct underlying the qui tam action." (Emphasis in original.) *Health Care Industry Liability Insurance Program*, 566 F.3d at 694-95.

The nursing home persisted in its claims that there was at least a potential for coverage under the commercial general liability policy, directing the court to the factual allegations in the complaint rather than the alleged legal theory, which included numerous specific references to personal injuries sustained by nursing home residents. *Health Care Industry Liability Insurance Program*, 566 F.3d at 696. The court agreed that factual allegations certainly are important to a coverage determination, but only if those allegations are directed to a theory of recovery. *Health Care Industry Liability Insurance Program*, 566 F.3d at 696 (relying on *Illinois Emcasco Insurance Co. v. Northwestern National Casualty Co.*, 337 Ill. App. 3d 356, 360, 785 N.E.2d 905, 908 (2003)).

The court found as follows: "[I]t is impossible to construe the underlying complaint as raising any theory of recovery based on bodily injury. Neither of the plaintiffs in the underlying suit seeks damages for personal injury caused by substandard medical care. Nor could they *** [because] they lack standing to sue on the residents' behalf." *Health Care Industry Liability Insurance Program*, 566 F.3d at 696.

Although *Health Care Industry Liability Insurance Program* involved commercial general liability coverage, which distinguishes the case from the medical malpractice insurance at issue in this case, the two cases remain quite similar. Both cases stem from *qui tam* cases filed by former employees relative to false governmental health insurance reimbursement claims. Both cases were filed pursuant to the federal False Claims Act. In *Health Care Industry Liability Insurance Program*, the nursing home argued that the underlying "injuries" to the nursing home residents were at the core of the False Claims Act allegations and that thus the claims involved injuries which triggered the insurer's duty to defend the *qui tam* action. Similarly in this case, Jackson claims that the underlying alleged unnecessary medical procedures and surgeries constitute "personal injuries" necessitating the duty to defend. The court in *Health Care Industry Liability Insurance Program* determined that while the nursing home residents added a personal touch to the allegations, the issue in the *qui tam* case was false billings that had nothing to do with alleged bodily injuries to the residents. *Health Care Industry Liability Insurance Program*, 566 F.3d at 694-95. The fact that the insurer might have to defend a medical malpractice claim stemming from a claim subject to the false claim allegations does not require a finding that the same insurer is required to defend the *qui tam* case tied to the false claim allegations. As in *Health Care Industry Liability Insurance Program*, the plaintiffs in the underlying case here, the former employees of Jackson, do not seek damages for personal injury caused by medical care falling below the requisite standard of care, nor could they, because they do not have standing to sue on behalf of these patients. See *Health Care Industry Liability Insurance Program*, 566 F.3d at 696. We conclude, as did the court in *Health Care Industry Liability Insurance Program*, that the proof required to sustain a claim for personal injuries, like a medical malpractice claim, is clearly distinct from the proof required for a claim for false filings of claims for medical reimbursement.

Jackson further contends that coverage for the underlying *qui tam* suit is not precluded by any of the coverage exclusions found within the policy—specifically arguing that the defense of the suit is not precluded by the exclusion for actions for which criminal penalties could be assessed. Jackson correctly states that the law will not broadly

construe insurance policy clauses that serve to limit or exclude coverage, and in fact those clauses are to be liberally construed in favor of the insured. See *National Union Fire Insurance Co. of Pittsburgh, Pennsylvania v. Glenview Park District*, 158 Ill. 2d 116, 122, 632 N.E.2d 1039, 1042 (1994).

The court below did not base its decision upon the exclusionary clause. The court specifically stated that its decision was based upon the fact that the claims made in the underlying suit did not involve "personal injury" caused by "professional services." And while our review is *de novo*, we conclude that we do not need to reach this issue because this exclusion has no bearing on the ultimate issues of defense and of indemnification. In other words, we determine, as did the trial court, that the issue can be determined on other bases without reference to this particular coverage exclusion.

After our consideration of the record, briefs, and arguments on appeal, as well as the applicable case law, we conclude that the trial court's determination that there were no claims being made involving "personal injury" caused by "professional services" was correct. Given the allegations made in the underlying case against Jackson, we do not believe that there was any potential for coverage. Jackson's attempt to establish a connection to medical care by way of improper billing for that care is insufficient to persuade us that the events qualify as "personal injury." Fraud-based state claims and/or federal claims against Jackson stemming from Medicare billing have no connection to the physical injuries contemplated for coverage under this medical malpractice policy. We find it impossible to construe the allegations of the underlying complaint as supporting any theory of recovery based on bodily injury.

Jackson finally contends that ISMIE is estopped from asserting its policy defenses because it neglected to timely seek a declaration of its rights and duties under the policy. Jackson argues that ISMIE failed to reserve its rights, having waited to file the declaratory judgment action until 13 months after first notice of the underlying lawsuit.

Generally speaking, an insurer that believes that there is no duty to defend or indemnify under its policy must either defend the suit under a reservation of rights or seek a declaratory judgment. *Economy Fire & Casualty Co. v. Brumfield*, 384 Ill. App. 3d 726, 730-31, 894 N.E.2d 421, 425-26 (2008). Failing to do so will result in the insurer being estopped from later raising its policy defenses to coverage. *Economy Fire & Casualty Co.*, 384 Ill. App. 3d at 730-31, 894 N.E.2d at 426.

However, if the pleadings of the underlying complaint do not include facts that bring the case within or potentially within coverage

under the policy, an insurer has no duty to defend. *Employers Insurance of Wausau v. Ehlco Liquidating Trust*, 186 Ill. 2d 127, 153, 708 N.E.2d 1122, 1136 (1999). The conclusion that an insurer has no duty to defend a case arises if, when the insurance policy and the complaint allegations are compared, "there clearly was no coverage or potential for coverage." *Employers Insurance of Wausau*, 186 Ill. 2d at 151, 708 N.E.2d at 1135.

Based upon the allegations of the underlying complaint and the provisions of the insurance policy, there was no potential for this coverage. Estoppel cannot be utilized in order to create coverage if none existed otherwise. See *Nationwide Mutual Insurance Co. v. Filos*, 285 Ill. App. 3d 528, 533, 673 N.E.2d 1099, 1103 (1996). Notwithstanding, ISMIE timely filed its declaratory judgment action. In a letter dated August 7, 2007, ISMIE informed Jackson that its coverage pursuant to the Medicare investigation provision of the policy had been exhausted, effectively putting Jackson on notice that future defense costs would be borne by Jackson. ISMIE's declaratory judgment action, filed less than two months later, falls well within the range of "reasonable time" utilized by the Illinois courts. See *Korte Construction Co. v. American States Insurance*, 322 Ill. App. 3d 451, 460, 750 N.E.2d 764, 771-72 (2001) (an insurer will be estopped from raising its defense of noncoverage if the insurer takes no action to adjudicate the coverage issue); *L.A. Connection v. Penn-America Insurance Co.*, 363 Ill. App. 3d 259, 266, 843 N.E.2d 427, 433 (2006) (a two- to six-month period is deemed a reasonable delay); *State Automobile Mutual Insurance Co. v. Kingsport Development, LLC*, 364 Ill. App. 3d 946, 961, 846 N.E.2d 974, 987 (2006) (a seven-month period is deemed a reasonable delay); *West American Insurance Co. v. J.R. Construction Co.*, 334 Ill. App. 3d 75, 87, 777 N.E.2d 610, 620 (2002) (a 21-month period is deemed an unreasonable delay). ISMIE undertook the defense under its endorsement immediately and continued the defense until the limits were exhausted. In under two months from the date when the limits had been exhausted, ISMIE filed its declaratory judgment action. The declaratory judgment filing was timely, and estoppel is inapplicable in this case.

For the foregoing reasons, the judgment of the circuit court of Williamson County is hereby affirmed.

Affirmed.

WEXSTTEN and STEWART, JJ., concur.