2020 IL App (1st) 191648
No. 1-19-1648
Opinion filed September 14, 2020

First Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | |
|---|---|
| GENERAL CASUALTY COMPANY OF WISCONSIN, a Wisconsin Insurance Corporation, and GENERAL CASUALTY INSURANCE COMPANY, a Wisconsin Insurance Corporation, | ) Appeal from the<br>) Circuit Court of<br>) Cook County.<br>) |
| Plaintiffs and Counterdefendants-Appellees, | ) No. 16 CH 5263<br>) |
| v. | ) Honorable<br>) Neil A. Cohen, |
| BURKE ENGINEERING CORPORATION *et al.* [*] | ) Judge, presiding.<br>) |
| Defendants | )<br>) |
| (Ronald Arlen *et al*., Defendants and Counterplaintiffs-Appellants). | )<br>) |

_____

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Presiding Justice Griffin concurred in the judgment and opinion.
Justice Walker dissented, with opinion.

**OPINION**

¶ 1    Defendant Burke Engineering Corporation (Burke) was sued for assisting the Village of

Crestwood (Village or Crestwood) conceal the release of contaminated well water to its residents.

Burke tendered defense of the lawsuits to its two insurers, General Casualty Company of

_____
[*]See the appendix to this opinion for a list of all defendants and counterplaintiffs.

Wisconsin (General Casualty) and Essex Insurance Company. After the cases settled for $18.3 million, General Casualty denied coverage and sued for a declaration that it had no duty to defend or indemnify Burke for its intentional conduct. The residents filed a counterclaim alleging, in part, that General Casualty breached its contract by denying coverage and acted in bad faith under section 155 of the Illinois Insurance Code (215 ILCS 5/155 (West 2016)). They also filed an affirmative defense asserting estoppel based on General Casualty's failure to defend under a reservation of rights or file a timely declaratory action.

¶ 2       The trial court granted General Casualty's motion for summary judgment on its complaint and on the counterclaim, finding that the plaintiff-residents failed to allege facts showing Burke's conduct was accidental or unintentional. The plaintiff-residents contend the trial court erred because (i) their complaints raised the possibility of coverage, which triggers the duty to defend, (ii) General Casualty was not an excess insurer because its policies conflicted with the Essex policy, (iii) General Casualty acted unreasonably in refusing to defend, and (iv) General Casualty acted in bad faith under section 155 of the Insurance Code.

¶ 3       We affirm. The plaintiff-residents' complaints failed to allege facts that trigger coverage and the duty to defend. General Casualty was not required to indemnify Burke for the settlement agreement and did not act in bad faith in denying coverage. Because General Casualty had no duty to defend Burke, we need not address whether it operated as an excess insurer.

¶ 4       After more than a decade of litigation, we realize that this is a disappointing result for the residents of Crestwood. In applying insurance law, though, the amount of harm is not, and should never be, taken into consideration. Otherwise, the law becomes unpredictable, totally arbitrary, and dependent on the whim of the individual judge, all of which is repugnant to the rule of law.

¶ 5                                    BACKGROUND

¶ 6      The Village supplies its residents with Lake Michigan water purchased from a neighboring town and water from privately owned wells. In 1985, the Illinois Environmental Protection Agency (IEPA) informed Crestwood's mayor and other Village officials that one well (Well Number 1) was contaminated with toxic chemicals, including known carcinogens, making its water unsafe for human consumption.

¶ 7      Between 1980 and 2006, Burke provided water engineering and consultation services to the Village, performing audits of its water supply and helping the Village prepare water usage reports for government agencies. With Burke's advice and assistance, Village officials reported to the IEPA that the Village supplied its water from Lake Michigan and placed its well water on "emergency backup" status. This was not true. While telling its residents that water came exclusively from Lake Michigan and was safe to drink, the Village actually used Well Number 1 as a source and avoided testing it for chemical pollutants.

¶ 8      In November 2007, the IEPA discovered the Village regularly used contaminated Well Number 1, pumping millions of gallons of tainted drinking water to residents. In August 2008, the Village mayor admitted to the IEPA that the Village had been supplementing Lake Michigan water with water from Well Number 1. In April 2009, the Chicago Tribune reported on the Village's use of the contaminated well. Later that year, residents began suing the Village, its past and current mayor, and other Village officials. The suits sought damages for personal injuries allegedly caused by the contaminated water, including multiple forms of cancer and death. Eventually, the suits were consolidated.

¶ 9 Initially, Burke was not named as a defendant. The plaintiff-residents discovered Burke's involvement during discovery. Documents showed Burke knew the Village had been using contaminated Well Number 1 and yet prepared reports for the Village concealing that use from the IEPA and the public. The criminal trial of the Village's former water department supervisor revealed additional facts on Burke's involvement. Evidence from that trial showed that yearly Burke prepared private documents for Village officials detailing the pumping of millions of gallons from Well Number 1 while simultaneously preparing false audit reports for state regulators concealing the well's use.

¶ 10 Once the plaintiff-residents learned of Burke's participation, they added Burke as a defendant. The initial pleadings against Burke in the fourth amended complaint included claims for negligence, violations of the Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 *et seq.* (West 2016)), common law fraud, and civil conspiracy to commit fraud. (A fifth amended complaint was filed a short time later, which included the same allegations against Burke.) In the negligence count, the plaintiff-residents alleged that Burke "by and through its agents breached their fiduciary duty by failing to disclose the harmful chemicals in the water to the public." In the same count, the plaintiff-residents alleged Burke "intentionally concealed the fact that it was using well water contaminated with hazardous chemicals to supply tap water *** to avoid the cost of making water safe."

¶ 11 The trial court granted Burke's motion to dismiss all claims with prejudice except the civil conspiracy to commit fraud count, which the court dismissed without prejudice. In dismissing the negligence count, the trial court said, "[n]ot only have Plaintiffs failed to make any allegations in

their complaint that Defendant had a duty pursuant to the Illinois Administrative Code, but this court cannot imagine a scenario in which Plaintiffs could properly plead such a duty."

¶ 12    The sixth amended complaint realleged against Burke facts in support of their claim for civil conspiracy to commit fraud. Specifically, that complaint alleged Burke advised the Village how to conceal their use of Well Number 1 for the illegal purposes of avoiding detection by authorities and avoiding mandated testing and reporting. It also alleged Burke's involvement in civil conspiracy with the Village and Village officials by agreeing to deceive the plaintiff-residents and their decedents on the use and presence of contaminated well water.

¶ 13                        Tender of the Underlying Complaint

¶ 14    Burke tendered the underlying suits to Essex under a claims-made professional liability policy in effect when the first suit against Burke was filed. That policy provided coverage in the amount of $1 million, which included defense costs. Essex agreed to defend Burke.

¶ 15    Burke also tendered the underlying suits to General Casualty under general liability policies issued between December 1, 1997, to December 1, 2010. The relevant policy provisions are the same in every policy and provide:

> "a. We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' *** to which this insurance applies.
>
> * * *
>
> b. This insurance applies:
>
> To 'bodily injury' *** only if:
>
> (a) The 'bodily injury' *** is caused by an 'occurrence' ***
>
> (b) The 'bodily injury' *** occurs during the policy period."

¶ 16    The General Casualty primary liability policies define "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

¶ 17    The General Casualty primary liability policies also contain an exclusion for injury or damage that was expected or intended:

"This insurance does not apply to:

a. Expected or Intended Injury

'Bodily injury' or 'property damage' expected or intended from the standpoint of the insured."

¶ 18    In addition, General Casualty issued umbrella liability policies to Burke effective from December 1, 1997 to December 1, 2010, which similarly covered excesses of the underlying primary insurance for any "bodily injury" caused by an "occurrence," defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The umbrella policy excluded coverage for "expected or intended" injuries from the standpoint of the insured.

¶ 19    Burke gave General Casualty notice of the fourth amended complaint in June 2013. General Casualty acknowledged the claim and reserved its rights, advising Burke it would be undertaking an investigation of potential coverage under the policies.

¶ 20    On March 28, 2014, counsel for General Casualty sent a letter to Burke asserting that under the policies, coverage would be excess to that provided by Essex. The letter set forth several grounds for lack of coverage including (i) the complaint did not allege bodily injury or property damage caused by an "occurrence" and (ii) the policies excluded coverage for expected or intended injuries, as alleged in the complaint. Specifically, the letter stated that "[t]he complaint repeatedly

alleges that the release of contaminated water from the Well caused injuries, and that the release happened purposefully and with the defendants' knowledge of the probably harmful consequences" and thus "[t]here is no allegation of any accident." The letter said the complaint "repeatedly alleges that the Plaintiffs were injured by the release of contaminated water from the Well that, as is variously alleged, the Defendants and Burke accomplished, permitted, suggested or concealed with knowledge of the probable harmful consequences."

¶ 21    After the fifth amended complaint, General Casualty again denied coverage, writing Burke that the complaint does "not allege bodily injury or property damage caused by an accident" but instead repeatedly alleges the plaintiffs "were injured by the release of contaminated water from the Well that, as is variously alleged the Defendants and Burke accomplished, permitted, suggested or concealed with knowledge of the probable harmful consequences."

¶ 22                                    Settlement

¶ 23    Burke and the plaintiff-residents began settlement talks with a private mediator in October 2014. A General Casualty representative was initially present but later decided not to participate. The initial mediation was unsuccessful, but the parties agreed to continue negotiations. Before the next mediation session, General Casualty informed Burke it intended to file a declaratory judgment action. Thereafter, mediation resulted in a settlement agreement against Burke for $18.3 million. Essex paid its remaining policy limits of $298,422.56, leaving an outstanding settlement amount of $18,001,577. Under the settlement agreement, redress rested exclusively on an assignment of Burke's rights in the General Casualty insurance policies.

¶ 24                        Declaratory Judgment Complaint

¶ 25    General Casualty filed a complaint for declaratory judgment, arguing it had no duty to defend Burke in the underlying suits because the claims arose outside the provisions of Burke's insurance policies and exclusions barred coverage.

¶ 26    The plaintiff-residents filed a counterclaim, alleging breach of contract (count I), waiver and estoppel (count II), and bad faith under section 155 of the Insurance Code (215 ILCS 5/155 (West 2016)) (count III). (Count II, which alleged General Casualty waived its right to assert defenses to coverage and was estopped from raising them, was dismissed.) They also filed an affirmative defense asserting estoppel based on General Casualty's failure to defend under a reservation of rights or file a timely declaratory action.

¶ 27    General Casualty moved for summary judgment, arguing it had no duty to defend Burke because the factual allegations of the underlying complaints did not fall within or potentially within the coverage of the policies. Specifically, General Casualty contended regardless of the label placed on the allegations, they all involved allegedly intentional conduct by Burke, which did not constitute an "occurrence" under the policies. General Casualty also argued that estoppel does not apply to create coverage when there is no duty to defend and that it cannot be found to have acted in bad faith under section 155 of the Insurance Code without coverage or a duty to defend.

¶ 28    The trial court granted summary judgment for General Casualty. The court found that the factual allegations failed to allege an "occurrence," namely, an accident, under the policies. Indeed, plaintiff-residents alleged intentional conduct, namely, that Burke knew the Village used water from the contaminated well and had intentionally advised the Village to hide that fact from the IEPA and the residents. The court stated, "[t]hese factual allegations do not allege 'an unforeseen occurrence' or 'sudden or unexpected event.' Rather, the factual allegations set forth only

intentional conduct by Burke." The "negligence" counts were irrelevant because the "court looks at the actual factual allegations, not the label." And, in the absence of "a single factual allegation" supporting the existence of an "occurrence" as defined by the policies, there was no potential coverage and no duty to defend. The trial court also found the allegations came within the policies' exclusions for intentional conduct. Finally, the court granted summary judgment to General Casualty on the counterclaims and affirmative defenses on the basis that it had no duty to defend, did not breach its contract or act in bad faith, and could not be estopped from denying coverage.

¶ 29                                    ANALYSIS

¶ 30                              Standard of Review

¶ 31    Summary judgment will be denied "where there is a dispute as to material facts, or where, the material facts being undisputed, reasonable persons might draw different inferences from the facts" and the moving party is entitled to judgment as a matter of law. (Internal quotation marks omitted.) *Wolfram Partnership, Ltd. v. LaSalle National Bank*, 328 Ill. App. 3d 207, 215 (2001). The movant for summary judgment has the initial burden of proof. *Direct Auto Insurance Co. v. Beltran*, 2013 IL App (1st) 121128, ¶ 43. We review a disposition of summary judgment *de novo*. *Id.*

¶ 32                                Duty to Defend

¶ 33    In determining an insurer's duty to defend an insured in an underlying suit, we compare the allegations in the underlying suit with the relevant policy language. *Pekin Insurance Co. v. Centex Homes*, 2017 IL App (1st) 153601, ¶ 34. We liberally construe the underlying complaint and policy in the insured's favor. *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, 144 Ill. 2d 64, 74 (1991). The threshold to trigger the duty to defend is low. *State Farm Fire &*

*Casualty Co. v. Tillerson*, 334 Ill. App. 3d 404, 408 (2002). An insurer must defend an action "unless it is clear from the face of the underlying complaint that the allegations fail to state facts which bring the case within, or potentially within, the policy's coverage." (Emphasis omitted.) *Wilkin*, 144 Ill. 2d at 73.

¶ 34 The plaintiff-residents argue that their allegations potentially fall within the insurance policy, thus triggering coverage. They reason that General Casualty's duty to defend was triggered by alleging that Burke was negligent in breaching its fiduciary duty to inform the public about the contaminated water. Even though those allegations were later dismissed with prejudice, recovery was still possible, they assert, because they filed amended complaints preserving the negligence counts for appeal and intended to amend their complaints to allege negligence based on statutory violations. They frame the critical question as whether the allegations give rise "to the possibility of recovery," with the exact "probability of recovery" being irrelevant. *Western Casualty & Surety Co. v. Adams County*, 179 Ill. App. 3d 752, 756 (1989).

¶ 35 The plaintiff-residents rely on *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90 (1992), to argue they met the minimal pleading requirements to trigger the duty to defend. In *Outboard Marine*, the insured sought defense and indemnification from its comprehensive general liability insurers after the government sued it for allegedly releasing toxic chemicals into a nearby harbor and Lake Michigan over a number of years. *Id.* at 98. The policies had a "pollution exclusion," which barred coverage for the release of environmentally toxic materials except when "sudden and accidental." (Emphasis omitted.) *Id.* at 118. The policy did not define "sudden" but defined "accident" to include "continuous or repeated exposure to conditions,

which results in *** property damage neither expected nor intended from the standpoint of the insured." (Emphasis and internal quotation marks omitted.) *Id.* at 123.

¶ 36    The insurer moved for summary judgment, arguing it had no duty to defend or indemnify under the "pollution exclusion" provision. *Id.* at 99. The trial court agreed. *Id.* at 100. In affirming, the appellate court construed "sudden" to mean abrupt and the release of toxic chemicals over several years precluded "abrupt." *Id.* at 119-20.

¶ 37    The supreme court reversed, finding "sudden" as ambiguous and, construing it in favor of the insured, to mean "unexpected" or "unintended." *Id.* at 121. Thus, "the sudden and accidental exception to the policies' pollution exclusion provision applies to unexpected and unintended releases of pollutants, recreating coverage for such releases." *Id.* at 126. Because the underlying complaints merely alleged that the insured discharged toxic chemicals into the harbor for several years and did not allege the insured intended to do so, the underlying complaints alleged facts potentially within coverage. *Id.*

¶ 38    The plaintiff-residents contend their complaints allege Burke negligently failed to inform Village residents of the contaminated water so a possibility exists, as in *Outboard Marine*, that the injuries were unexpected, triggering the duty to defend. We disagree. First, in *Outboard Marine*, the issue was whether a policy exclusion applied, not whether the complaint's allegations against the insured fell within policy coverage. More significantly, in *Outboard Marine*, the underlying complaint never alleged intentional conduct by the insured. The plaintiffs merely alleged Outboard Marine discharged toxic chemicals into the harbor and argued that the pollution exclusion did not bar coverage. Conversely, the complaints here allege Burke knew the well water to be contaminated and intentionally advised the Village to hide that fact. The underlying complaints

further allege Burke intentionally concealed the facts from the plaintiff-residents and intentionally misrepresented that the water's safety. These factual allegations do not allege "an unforeseen occurrence" or "sudden or unexpected event."

¶ 39    That the underlying complaints also contained "negligence" counts is irrelevant. A court looks at the actual factual allegations, not the label. See, *e.g.*, *Westfield National Insurance Co. v. Continental Community Bank & Trust Co.*, 346 Ill. App. 3d 113, 123 (2003) ("[w]e are not persuaded by the minors' attempt to recast as negligence the expected or intended acts of an insured in an attempt to defeat the intended-acts exclusion" of the policies); *State Farm Fire & Casualty Co. v. Watters*, 268 Ill. App. 3d 501, 510 (1994) (underlying complaint's allegations of negligent infliction of emotional distress are transparent attempt to trigger insurance coverage when insured's conduct was plainly intentional). And the factual allegations that Burke failed to disclose the contamination and conspired with the Village to hide that fact set forth only intentional conduct. *Atlantic Mutual Insurance Co. v. American Academy of Orthopaedic Surgeons*, 315 Ill. App. 3d 552, 563-65 (2000) (allegations that underlying defendants "failed to disclose" pertinent information to injured parties alleged intentional, not negligent, conduct because potential for coverage determined by facts alleged, not semantics of underlying suit).

¶ 40    In the negligence count, the plaintiff-residents "repeat, adopt, and reallege" all of the factual allegations made to that point. And those allegations state intentional conduct, which undermines the dissent's premise that a court could find Burke acted negligently in failing to disclose the harmful chemicals to the public. Of particular note, the plaintiff-residents alleged Burke sent a letter informing Crestwood that its "water system suffered from substantial leaks" and "of the large cost associated with repairing such leaks and recommended that a possible course

of action *** would be to conceal the presence of these leaks from the EPA and other regulatory." Moreover, the negligence count itself reiterates that Burke "intentionally concealed the fact that it was using well water contaminated with hazardous chemicals to supply tap water to the Plaintiffs." The underlying complaints do not contain any factual allegations supporting the existence of an "occurrence" as defined by the policies.

¶ 41                                    Facts Outside of the Complaint

¶ 42    The plaintiff-residents contend that had the trial court looked beyond the four corners of the complaint, it would conclude General Casualty had a duty to defend. Although courts generally compare the allegations in the underlying suit with the relevant policy language in determining an insurer's duty to defend an insured (*Pekin Insurance Co.*, 2017 IL App (1st) 153601, ¶ 34), a line of cases holds that if the insurer "has knowledge of true but unpleaded facts" showing the claim "potentially within the policy's coverage" that suffices to trigger the duty to defend. *Associated Indemnity Co. v. Insurance Co. of North America*, 68 Ill. App. 3d 807, 816 (1979). The plaintiff-residents assert that, in correspondence with Burke, General Casualty acknowledged the possibility of coverage, which alone should trigger coverage. Further, they contend General Casualty knew they intended to amend their complaint to add a statutory negligence claim and to pursue their common law negligence claim on appeal, which also created the potential for coverage and the duty to defend.

¶ 43                              *General Casualty's Correspondence*

¶ 44    According to the plaintiff-residents, General Casualty admitted in correspondence that it might have a duty to defend, which precludes summary judgment. They say that General Casualty's March 28, 2014, letter to Burke's attorney acknowledges a "potential" that one of the

policies covered Burke and, if so, the policy "potentially" provides coverage. For support, they rely on *American Standard Insurance Co. of Wisconsin v. Gnojewski*, 319 Ill. App. 3d 970 (2001).

¶ 45      The insurer in *American Standard*, Gallant Insurance Company (Gallant), insured automobiles owned by Gnojewski. *Id.* at 971. After Gnojewski defaulted on her premium payments, Gallant notified her that the policy would be cancelled effective June 10, 1995. *Id.* at 972. On August 1, 1995, Gnojewski and another motorist died in an auto accident. The other motorist's estate sued Gnojewski's estate for negligence. *Id.* at 972. Gnojewski's estate argued Gallant could not deny coverage because Gallant had failed to send a cancellation notice to the lender who had a perfected security interest in the automobile, as required by Illinois law. *Id.* at 974-75. Gallant was unaware of the lender's lien. The court had to decide whether the Insurance Code provision requiring the insurer to send a cancellation notice to affected lienholders, "if known," includes a lienholder of which it had constructive notice. *Id.* at 974-75. The court concluded that at least the potential for coverage existed because the cancellation notice may not have been effective. *Id.* at 977 ("The key to this case is that [the interpretation of 'if known'] is a disputed question."). This potential for coverage, though minimal, triggered Gallant's duty to defend Gnojewski under the reservation of rights or file a declaratory judgment action. *Id.* Gallant did neither, which violated its duty to defend and barred it from raising policy defenses to coverage. *Id.* at 978.

¶ 46      The plaintiff-residents argue that in *American Standard* communications from the insurer showed the duty to defend. Intraoffice memos between Gallant's employees indicated discussions on whether coverage existed. But the *American Standard* court did not rely on the insurer's intraoffice correspondence in finding the duty to defend. Instead, the court held Gallant's

obligation to either defend under a reservation of rights or file a declaratory judgment action triggered by the uncertainty as to whether Gallant had to notify the lienholder of the cancellation.

¶ 47   More significantly, while the correspondence includes phrases like "potential for coverage," when read in its entirety, that does not create a duty to defend. The letters never admit a duty to defend, nor state that the allegations of the underlying complaints potentially come within the insuring agreement of the policies. Rather, the letters inform Burke that General Casualty had no duty to defend and specifically state the claims do not allege an "occurrence" in the scope of the expected or intended injury exclusion. The March 28 letter states, "[t]he complaint also can be repeatedly interpreted to allege expected or intended injury, which the policies exclude, and injury that was not caused by an occurrence, which the policies do not cover." And a later letter from General Casualty explicitly notes, "[t]he complaints do not allege bodily injury or property damage caused by an accident." The correspondence neither indicate an admission of coverage nor provide a basis for reversing the trial court.

¶ 48                    *Other Facts Outside of the Complaint*

¶ 49   The plaintiff-residents also assert General Casualty knew their complaint would be amended to raise a statutory negligence claim against Burke and that they planned to appeal the dismissal of their common law negligence claims, both of which could raise coverage. They argue the trial court improperly ignored the insurer's knowledge that the complaint against its insured would be amended to include claims that could be covered. This, they contend, triggers the duty to defend. They cite no Illinois cases in support of this argument, only a Pennsylvania appellate court ruling in *Heffernan & Co. v. Hartford Insurance Co. of America*, 614 A.2d 295, 298 (Pa. Super. Ct. 1992), which is distinguishable.

¶ 50    In *Heffernan*, the complaint against the insured did not allege facts that would trigger the insurer's duty to defend. *Id.* at 298. During discovery, the plaintiffs learned of a claim against the insured that would undoubtedly be covered. *Id.* This sufficed to put the insurer "on notice" that a claim triggering its duty to defend would be filed. *Id.* Even though the complaint had not yet been amended to include these allegations, that the complaint could be amended before final judgment triggered the duty to defend. *Id.*

¶ 51    Trying to squeeze within the facts of *Heffernan*, plaintiff-residents contend they planned to amend their complaint to include statutory negligence claims and to continue to pursue their common law negligence claims on appeal, so General Casualty knew Burke might be found liable under a negligence theory and had a duty to defend. We disagree. Although the plaintiff-residents intended to amend their complaint, nothing in the record supports their assertion that Burke's conduct was an accidental occurrence. Unlike in *Heffernan*, where the claims would be indisputably covered once amended, the plaintiff-residents cannot allege facts to support a negligence claim. In dismissing the negligence counts, the trial court stated, "[n]ot only have Plaintiffs failed to make any allegations in their complaint that Defendant had a duty pursuant to the Illinois Administrative Code, but this court cannot imagine a scenario in which Plaintiffs could properly plead such a duty." This does not lead to the conclusion that General Casualty knew it might be liable to defend Burke.

¶ 52                                   Estoppel

¶ 53    The estoppel doctrine applies only where the insurer has breached the duty to defend and fails to either file a timely declaratory judgment action or defend under a reservation of rights. *Bartkowiak v. Underwriters at Lloyd's, London*, 2015 IL App (1st) 133549, ¶ 47; *Employers*

*Insurance of Wausau v. Ehlco Liquidating Trust*, 186 Ill. 2d 127, 151 (1999) ("Application of the estoppel doctrine is not appropriate if the insurer had no duty to defend, or if the insurer's duty to defend was not properly triggered."). "In other words, the estoppel doctrine cannot create coverage where none existed in the first place." *Bartkowiak*, 2015 IL App (1st) 133549, ¶ 48 (citing *ISMIE Mutual Insurance Co. v. Michaelis Jackson & Associates, LLC*, 397 Ill. App. 3d 964, 974 (2009)).

¶ 54    The trial court correctly held the underlying complaints did not allege conduct by Burke constituting an occurrence. So, estoppel cannot apply to create coverage.

¶ 55                                     Remaining Claims

¶ 56    Having ruled that General Casualty did not have a duty to defend, we need not address the question of whether General Casualty operated as an excess insurer. We also need not address whether General Casualty must indemnify Burke for acting unreasonably or in bad faith by refusing to defend Burke. The duty to defend is broader than the duty to indemnify and there must be a duty to defend for there to be a duty to indemnify. *Id*. ¶ 27 ("where an insurer has no duty to defend, it necessarily has no duty to indemnify"). As a matter of law, General Casualty had no duty to defend Burke in the underlying complaints, and it also had no duty to indemnify Burke for the underlying settlement.

¶ 57    Affirmed.

¶ 58    JUSTICE WALKER, dissenting:

¶ 59    I respectfully dissent because General Casualty had a duty to defend its insured, Burke. This case comes to us on appeal from a summary judgment entered in favor of the insurer, General Casualty, on a complaint for a judgment declaring that it had no duty to defend or indemnify Burke in the underlying lawsuit the citizens of Crestwood filed against the Village and Burke. The

underlying lawsuit settled without trial. Because of the procedural posture of the case, no court has determined the accuracy of any of the allegations of the underlying complaint.

¶ 60    This court needs to decide only whether the allegations of the underlying complaint impose on General Casualty a duty to defend or indemnify its insured, Burke, in the underlying lawsuit. Our supreme court stated the applicable standards in *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, 144 Ill. 2d 64, 73 (1991), where the court held that the insurer has a duty to defend whenever the allegations of the complaint "do not preclude potential coverage under the policy.'

¶ 61    General Casualty asserts that it has no duty defend or indemnify because the policy excludes coverage for bodily injury and property damage "expected or intended from the standpoint of the insured." The majority correctly observes that the plaintiffs in the underlying lawsuit repeatedly and forcefully allege facts that, if proven, would show that Burke expected and intended injury to follow from its actions. Despite the majority's observation, under Wilkin, the question we face is not whether the complaint includes allegations of conduct the insurance does not cover. Instead, we must determine whether the lawsuit precludes coverage. "The insurer may refuse to defend only if the insurance contract cannot possibly cover the liability arising from the facts alleged." *Illinois Emcasco Insurance Co. v. Northwestern National Casualty Co.*, 337 Ill. App. 3d 356, 361 (2003). Could a court hold Burke liable even if the citizens of Crestwood failed to prove that Burke expected or intended its actions to cause bodily injury or property damage? To the question correctly stated, this court should answer: "yes, the court could hold Burke liable."

¶ 62    The citizens alleged that Burke "breached [its] fiduciary duty by failing to disclose the harmful chemicals in the water to the public." Even if Burke acted only negligently, without

expecting or intending its actions to injure anyone, a court could hold Burke liable for breaching its fiduciary duty to disclose information concerning the water to the public. See *Board of Education of City of Chicago v. A, C & S, Inc.*, 131 Ill. 2d 428, 452-55 (1989). Thus, the complaint does not preclude coverage, and General Casualty had a duty to defend Burke. I would reverse the judgment entered in favor of General Casualty and remand for further proceedings in the circuit court.

No. 1-19-1648

¶ 63                                    APPENDIX

*Defendants*

BURKE ENGINEERING CORPORATION, an Illinois Corporation; CHARLENE EARLEY, as Special Administrator of the Estate of Diana Defilippis, Deceased; VINCENT A. ABETE, as Special Administrator of the Estate of Beverly Abete, Deceased; JEFFREY ADCOCK, as Special Administrator of the Estate of Debra Adcock, Deceased; JENNIFER ARLEN; MELISSA ARLEN; MICHAEL ARLEN; RONALD ARLEN; LYNN AVERY; THOMAS J. BADAL; SYLVIA BAKER, as Special Administrator of the Estate of Elmer Baker, Deceased; THERESA BARNES; DEBORAH BAUER; JANET BELAK; MICHAEL BELL SR.; THEODORE BERCH; DIANE BERRY, Individually and as Special Administrator of the Estate of Jeffrey Berry, Deceased; RAY BIALEK, Individually and as Special Administrator of the Estate of Donna Bialek, Deceased; KRISTEN BIEN, as Special Administrator of the Estate of James Bien, Deceased; JENNIFER BITTNER; LAURA BLAND, as Special Administrator of the Estate of George Bland, Deceased; JEFFREY BLAND; DEBORAH BOETTCHER; MARY BOLISENGA, as Special Administrator of the Estate of Joseph Bolisenga, Deceased; CAROLYN BUONICONTI; HAROLD BRADY; KATHLEEN BRENNAN; FRANK CALDARIO; DAVID CAMPBELL; KRISTINE TIGGELAAR, as Special Administrator of the Estate of Donald Campbell, Deceased; JOSEPH CAMPBELL; ROBERT CAMPBELL; SABINE CAMPBELL; RAYMOND CANTELO; RYAN CARTER, Individually and as Special Administrator of the Estate of Douglas Johnson, Deceased; JOANNE CASEY; SUSAN L. KHATTAB, as Special Administrator of the Estates of Betty S. Cheffer, Deceased, and Donald H. Cheffer, Deceased; TANYA CHAINEY; ANGIE CHAPA; TONY CHAPA; KAREN CHAPUT; DIANE CIEZADLO; FRANK CIEZADLO; KEVIN CLARK; ROBERT CLARK, as Parent and Next Best Friend of Andrew Clark, a Minor; SHARON CONNOLLY; JOYCE CONSDORF, as Special Administrator of the Estate of John Consdorf, Deceased; SHAWN CONWAY; RENATA CORLEY; KIMBERLY A. CRUCE; TIMOTHY AND LAURA DALEY, as Parents and Next Best Friends of Katherine Rose Daly, a Minor; ANGELA DEA; JOHN DEL MURO; SOCORRO DEL MURO; KELLY DELUISE; VINCENT DELUISE; DENNIS DEVRIES, as Special Administrator of the Estate of Gwendolyn Devries, Deceased; ROBERT DIBENEDETTO; SUSAN DIGUIDO; TERRY DIGUIDO; MICHELLE DOWNEY; GERALDINE POTTER, as Special Administrator of the Estates of Irene L. Doyle, Deceased, and William J. Doyle, Deceased; ROBERT DUBIN, as Special Administrator of the Estate of Kristin Dubin, Deceased; NORMA DUNCAN; ROBERT DUNLEAVY; MITCHELL DURLAK, as Special Administrator of the Estate of Nancy Durlak, Deceased; DION DWYER; MARIA EGAN; SUSAN EZERSKI, as Special Administrator of the Estate of Florence Rachuck, Deceased; ALLYSON FALLS; ANTHONY AND MONICA FIORENZO, as Parents and Next Best Friends of Nickolas Fiorenzo, a Minor; ED FITZGIBBONS; GERALDINE FITZGIBBONS; DEBBIE FLANNIGAN; CONSTANCE FREDRICK; HARRY FREDIRCK; MARYLOU FREEMAN; DANIEL FRIBERG; PATRICIA KRAUSE, as Special Administrator of the Estate of Brooke Fry, Deceased; EVERETT GALUSHA, as Special Administrator of the Estate of Mary Ann Galusha, Deceased; ADRIAN GARIBAY; JANET GERVASIO; STANLEY GIERTUGA; DAVID GONZALEZ; PHILLIP GORECKI; KURT GREGORY; ANGELA GRIGOLA; SUSAN GRIGOLA; DIANE GUSTAFSON, as Special Administrator of the Estate

- 20 -

of Elmer Gustafson, Deceased; ALEXANDER J.L. GUYETTE; DUANE HANACEK SR., as Special Administrator of the Estate of Duane Hanacek Jr., Deceased, and as Special Representative of Bernice Hanacek; JOANNE HAASE; ROBERT HAASE; PAMELA HARVEY; MIKE HAUSER, as Special Administrator of the Estate of Scott Hauser, Deceased; PAUL HERNANDEZ; TAMMY LAWSON-HERNANDEZ; MICHAEL HOULIHAN; BARBARA HULL; AUDREY ITHAL; GLENN ITHAL; JEFFREY ITHAL; NICOLE ITHAL; CLAUDIA JACKOWIAK, Individually and as Special Administrator of the Estate of Richard Jackowiak, Deceased; RUBY JANES; DAVID JEROSKI, Individually and as Special Administrator of the Estates of Albert Jeroski, Deceased, and Mary Jeroski, Deceased; CHRISTINE JIMENEZ; LINDA JODY, Individually and as Special Administrator of the Estates of Robert Nielsen, Deceased, and Karen Nielsen, Deceased; MARGARET JOHNSON, PERRY JORDAN, Individually and as Special Administrator of the Estate of Ingeborg Jordan, Deceased; CHRISTIE JOSZA; EILEEN JOSZA, Individually and as Parent and Next Best Friend of Kaylin Josza, a Minor; JENNIFER JOSZA; KAREN KACZYNSKI; RONALD KACZYNSKI; DEREK KALCHBRENNER; ELLEN KAKOSKA; DAWN KINCAID, as Special Administrator of the Estate of Fred Schneider, Deceased; BRENDA J. KILLEN; GARY KISSEL, as Special Administrator of the Estates of Kenneth Kissel, Deceased, and Marilyn Kissel, Deceased; JUDY KLESKER, as Special Administrator of the Estate of Gloria Klesker, Deceased; CHARLES KNOX; RONALD KOOIMA; DELORES KOPROWSKI, as Special Administrator of the Estate of Anthony Koprowski, Deceased; MATTHEW FRY; BRIANNE FRY; BRUCE KRYSTOF, as Special Administrator of the Estate of Ed Krystof, Deceased; BRIAN KWASNY, as Special Administrator of the Estate of DIANE KWASNY, Deceased; SUSANNE LANDING; ROSE LAMANTIA, as Special Administrator of the Estates of Mary Lamantia, Deceased, and Maurice Lamantia, Deceased; DEBBIE LARCHER; BRADLEY LARSON, Individually and as Special Administrator of the Estate of B. Jean Larson, Deceased; KATHLEEN LEWANDOWSKI, as Special Administrator of the Estate of Richard Lewandowski, Deceased; THOMAS LEAHY; BONITA LOEFFEL; WILLIAM LOEFFEL, Individually and as Special Administrator of the Estate of Sandra Loeffel, Deceased; CHRISTINE LOTZ, as Mother and Next Friend of Nicole Munoz, a Minor; PAUL MUNOZ; BRIAN LUCITT; FREDRICK LUNA, as Special Administrator of the Estate of Emma Luna, Deceased; KATHY LUDWIG-HERNANDEZ; ELIZABETH ANN LYSICK; DOUGLAS MACLEAN, as Special Administrator of the Estates of Barbara MacLean, Deceased, and Hany MacLean, Deceased; JACQUELINE MALDEN; JACOB MAREK; DAVE MARSZALEK; VANESSA MARTINEZ; DAVID MASON, as Special Administrator of the Estate of Tricia Mason, Deceased; DAVID MATAKIEWICZ; JEFF MATAKIEWICZ; ASHA MATHEW; MARIAMMA MATHEW; MICHAEL MASTERS; ELIZABETH TERESA McDERMOTT; SANDRA McELLIGOTT, Individually and as Special Administrator of the Estate of Jane S. Kramer, Deceased; JOHN McGLYNN; AMY McGOOGAN; JOE McGRATH; TYLER MCMASTER; JACQUALYNN McNEAL; GREGORY MECH; SANDRA METZGER, as Parent and Next Best Friend of Sara Metzger; BRIAN MEYER; VALERIE MEZYDIO; CLAUDIA MILLER; GERALD MITCHELL; THOMAS MITCHELL; CHERYL GOLDBERG, as Special Administrator of the Estate of Maureen Mossman, Deceased; PAUL MUNOZ; ROBERT M. MUDD; ERIC MUSILEK; ERNEST MUSILEK; KAREN MYSLIWIEC, as the Special Administrator of the Estate of Dennis Wika, Deceased; JASON NIEMOTH, as Special Administrator of the Estate of Annette Niemoth, Deceased; LAYNE NOVAK; TERRENCE O'NEILL; HARRIET O'NEILL; BETH

DIVIRGILIO, as Parent and Next Best Friend of Damen O'Shea; ROBERT O'TOOLE; KATHLEEN H. PARKER; SANDRA STEWART, as Special Administrator of the Estate of Sylvia Perry, Deceased; CATHERINE PETERSON; ERIC PLYMAN; DENNIS POLAK; GARY PONDEL; NANCY S. POTTER; TAMI PRINCIPE; LISA PRZYBYLA; JENNIFER RADA; MICHAEL RAMPICK; KAREN REGAN; DAVID REINICHE; PATRICIA REINICHE; SANDY REINSTEIN, Individually and as Parent and Next Best Friend of Lawrence Reinstein, a Minor; TERESA RICE; RICHARD T. RODRIGUEZ, as Special Administrator of the Estate of Karen Rodriguez, Deceased; DANIELLE S. PRUITT, as Special Administrator of the Estate of Martin K. Rodriguez, Deceased; SABRINA RODRIGUEZ; NICHOLE ROSS; KARIE SCACCIA, as Parent and Next Best Friend of Anthony Scaccia, a Minor; DANIEL DIXON, as Special Administrator of the Estate of Fredrick Schmaedeke, Deceased; LINDA SCHOBER, Individually and as Parent and Next Friend of Stephanie Schober and Matthew Schober; RYAN SCHOBER; GREG SEEBER; MORDENA SEPHUS; WESLEY SERAFIN; VINCENT SERAFINI, as Special Administrator of the Estate of Wayne Serafini, Deceased; MICHAEL SEWERYNOW; KAREN SILVA; HOWARD SMITH; LARRY SNYDER, as Special Administrator of the Estate of Lillian Snyder, Deceased; JOANN SOLTIS; LOUISE SOLNER; RICHARD SOLNER; LAWRENCE SPARKS; KIM GORZYCKI, as Special Administrator of the Estate of Carol Spiewak, Deceased; ROSEMARY STASZEL; SHIRLEY STEPP; AMY STERN; ANTHONY STERN; KRISTIN STRONER; SUE STUDZINSKI; MARILYN SULLIVAN; RONALD SZWAJKOWSKI, as Special Administrator of the Estate of Sharyn Szwajkowski, Deceased; AMY BOS; PAM TERRAZZINO, Individually and as Special Administrator of the Estate of Vince Terrazzino, Deceased; ALEX TERZICH; DEBORAH TERZICH; SARA TERZICH; HOUSTON THOMAS; ALYSSA THOMPSON; WILLIAM THOMPSON; KRISTINA TIGGELAAR, Individually and as Special Administrator of the Estates of Michael Bowers, Deceased, and John Tiggelaar, Deceased; LINDA TOMCZUK; PAUL TON; SHELLY TORSAN; CURTIS HAILEY; JEFFREY JOHN TUTTLE, Individually and as Parent and Next Best Friend of Aubrey Lynn Tuttle, a Minor, and Brianne Marie Tuttle, a Minor; DIANE ULASICH; MARCY ULASICH; THOMAS ULASICH; CONSTANTINO VIVACQUA; ARTHUR WACHOLZ; JUDY WACHOLZ; KEVIN WALSH, as Special Administrator of the Estate of Patrick Walsh, Deceased; THOMAS BERNARD WATTAM; ADRIANE WEYFORTH; ANNA WHITCOMB; SANDRA WHITE, as Special Administrator of the Estate of Robert White, Deceased; TRACY WILKINSON; ANN WISE, Individually and as Parent and Next Best Friend of Willow Victoria Raine Wise, a Minor; BETH WOYTEK VIBERG, as Special Administrator of the Estate of Amanda Woytek, Deceased; MICHELLE DOWNEY, as Special Administrator of the Estate of Brandi Young, Deceased; KATHLEEN YOUNG; VALERIE YOUNG; MELISSA ZIRBEL; RITAS ZIUPSNYS; JUDY ALICIA, as Special Administrator of the Estate of Edwin Alicia, Deceased; MERLINE ALLEN; THEO ALLEN; RAY ATTWOOD, as Special Administrator of the Estate of Joanne Attwood, Deceased; DENNIS BERNATOWICZ; CLAUDETTE BERNATOWICZ; BRIAN DONAUBAUER; RON DROZD; MARIANNE DROZD; SARAH KUIKMAN, as Special Administrator of the Estate of Joseph Bolisenga, Deceased; NANCY BRUCE, as Special Administrator of the Estate of Gordon Bruce, Deceased; ANITIA COBB, as Special Administrator of the Estate of Wesley Cobb, Deceased; KEN DARNELL, as Special Administrator of the Estate of Donna Darnell, Deceased; CHIQUITA McMILLON, Individually and as Special Administrator of the Estate of Barbara Grant, Deceased; PATRICK LACEY, as

Special Administrator of the Estates of Bernice Lacey, Deceased, and Robert Lacey, Deceased; DONALD LYNCH; KAREN LYNCH; LEANN RANKOVICH, as Special Administrator of the Estate of Peter Markusic, Deceased; BARBARA ROBERSON, Individually and as Special Administrator of the Estate of Jane Murawski, Deceased; CARL ROBERSON; BONNIE ROTHMAN; TODD ROTHMAN; ABBY SARENA; JACK SARENA; ARNOLD WARD; GENEVIVE WARD; DANIEL J. FLEMING, Individually and as Guardian of the Estate of Daniel A. Fleming, a Disabled Adult; NANCY GANNON; WILLIAM GANNON; QUIANA LINDSAY; FRED JONES; MICHELE MAAN DE KOK, as Executor of the Estate of John Maan De Kok, Deceased; ANGELINE MORSOVILLO; SHIRLEY OLATUNDE; LANA OLATUNDE; JANET ELLER, Individually and on Behalf of a Class of Similarly Situated Individuals; DONNA SIGNORE, Individually and as Special Administratrix of the Estate of Daryl Signore, Deceased; MARY SMETANA; LINDA SPENCER; DAWN FRY; MICHAEL WAKEHAM, as Special Administrator of the Estate of Robert Wakeham, Deceased; JOYCE WESOLOWSKI; KENNETH WESOLOWSKI; and LINDA JENSEN.

*Defendants and Counterplaintiffs-Appellants*

RONALD ARLEN; SYLVIA BAKER, as Special Administrator of the Estate of Elmer Baker, Deceased; THEODORE BERCH; LAURA BLAND, as Special Administrator of the Estate of George Bland, Deceased; MARY BOLISENGA, as Special Administrator of the Estate of Joseph Bolisenga, Deceased; CAROLYN BUINICONTI; RAYMOND CANTELO; SUSAN L. KHATTAB, as Special Administrator of the Estates of Betty S. Cheffer, Deceased, and Donald H. Cheffer, Deceased; DIANE CIEZADLO; FRANK CIEZADLO; JOYCE CONSDORF as Special Administrator of the Estate of John Consdorf, Deceased; TIMOTHY AND LAURA DALEY, as Parents and Next Best Friends of Katherine Rose Daley, a Minor; JOHN DEL MURO; SOCORRO DEL MURO; VINCENT DELUISE; DENNIS DEVRIES, as Special Administrator of the Estate of Gwendolyn Devries, Deceased; SUSAN DIGUIDO; MICHELLE DOWNEY; GERALDINE POTTER, as Special Administrator of the Estates of Irene L. Doyle, Deceased, and William J. Doyle, Deceased; NORMA DUNCAN; CHARLENE EARLEY; SUSAN EZERSKI as Special Administrator of the Estate of Florence Rachuck, Deceased; ED FITZGIBBONS; GERALDINE FITZGIBBONS; EVERETT GALUSHA as Special Administrator of the Estate of Mary Ann Galusha, Deceased; ADRIAN GARIBAY; STANLEY GIERTUGA; DIANE GUSTAFSON, as Special Administrator of the Estate of Elmer Gustafson, Deceased; DUANE HANACEK SR., as Special Administrator of the Estate of Bernice Hanacek, Deceased; JOANNE HAASE; ROBERT HAASE; CLAUDIA JACKOWIAK, Individually and as Special Administrator of the Estate of Richard Jackowiak, Deceased; RUBY JANES; DAVID JEROSKI, Individually and as Special Administrator of the Estates of Albert Jeroski, Deceased, and Mary Jeroski, Deceased; CHRISTINE JIMENEZ; LINDA JODY, Individually and as Special Administrator of the Estates of ROBERT NIELSEN, Deceased, and Karen Nielsen, Deceased; PERRY JORDAN, Individually and as Special Administrator of Ingeborg Jordan, Deceased; KAREN KACZYNSKI; RONALD KACZYNSKI; GARY KISSEL, as Special Administrator of the Estates of Kenneth Kissel, Deceased, and Marilyn Kissel, Deceased; JUDY KLESKER, as Special Administrator of the Estate of Gloria Klesker, Deceased; CHARLES KNOX; RONALD KOOIMA; BRUCE KRYSTOF, as Special Administrator of the Estate of Ed Krystof, Deceased; ROSE LAMANTIA, as Special

Administrator of the Estates of Mary Lamantia, Deceased, and Maurice Lamantia, Deceased; BRADLEY LARSON, Individually and as Special Administrator of the Estate of B. Jean Larson, Deceased; KATHLEEN LEWANDOWSKI, as Special Administrator of the Estate of Richard Lewandowski, Deceased; THOMAS LEAHY; WILLIAM LOEFFEL, Individually and as Special Administrator of the Estate of Sandra Loeffel, Deceased; CHRISTINE LOTZ, as Mother and Next Friend of Nicole Munoz, a Minor; PAUL MUNOZ; FREDERICK LUNA, as Special Administrator of the Estate of Emma Luna, Deceased; KATHY LUDWIG-HERNANDEZ; DOUGLAS MACLEAN, as Special Administrator of the Estates of Barbara MacLean, Deceased, and Harry MacLean, Deceased; MARIAMMA MATHEW; SANDRA McGELLIOT; JOE McGRATH; JACQUALYNN MITCHELL; GERALD MITCHELL; CHERYL GOLDBERG, as Special Administrator of Maureen Mossman, Deceased; ERIC MUSELIK; JASON NIEMOTH, as Special Administrator of the Estate of Annette Niemoth, Deceased; TERRENCE O'NEILL; HARRIET O'NEILL; BETH DIVIRGLIO, as Parent and Next Best Friend of Damen O'Shea, a Minor; SANDRA STEWART, as Special Administrator of Sylvia Perry, Deceased; KAREN REGAN; PATRICIA REINICHE; DANIELLE S. PRUITT, as Special Administrator of the Estate of Martin K. Rodriguez, Deceased; DANIEL DIXON, as Special Administrator of Frederick Schmaedeke, Deceased; MORDENA SEPHUS; WESLEY SARAFIN; VINCENT SERAFINI, as Special Administrator of the Estate of WAYNE SERAFINI, Deceased; MICHAEL SEWERYNOW; HOWARD SMITH; LARRY SNYDER, as Special Administrator of the Estate of Lillian Snyder, Deceased; LOUISE SOLNER; KIM GROZYCKI, as Special Administrator of Carol Spiewak, Deceased; SHIRLEY STEPP; MARILYN SULLIVAN; HOUSTON THOMAS; KRISTINA TIGGELAAR, Individually and as Special Administrator of John Tiggelar, Deceased; LINDA TOMCZUK; SHELLY TORSAN; CONSTATING VIVACQUA; ARTHUR WACHOLZ; JUDY WACHOLZ; KEVIN WALSH, as Special Administrator of Patrick Walsh, Deceased; THOMAS BERNARD WATTAM; ADRIANE WEYFORTH; and SANDRA WHITE, as Special Administrator of the Estate of ROBERT WHITE, Deceased.

---

**No. 1-19-1648**

---

| | |
|---|---|
| **Cite as:** | *General Casualty Co. of Wisconsin v. Burke Engineering Corp.*, 2020 IL App (1st) 191648 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 16-CH-5263; the Hon. Neil A. Cohen, Judge, presiding. |
| **Attorneys for Appellant:** | Jay Paul Deratany and Thomas Stewart, of The Deratany Firm, of Chicago, for appellants. |
| **Attorneys for Appellee:** | Eileen King Bower and Alexander W. Ross, of Clyde & Co US LLP, of Chicago, for appellees. |